FILED
2020 Feb-10  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **BILLY BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIVIL ACTION NO.:** |
| **v.** | ) |
| | ) |
| **TMS International, LLC** | ) |
| | ) **JURY DEMAND** |
| | ) |
| **Defendant.** | ) |

### COMPLAINT

COMES NOW the Plaintiff, Billy Brown ("Brown"), by and through his attorney of record, and for his Complaint against the Defendant, TMS International, Inc. ("TMS"), states the following:

### I.    JURISDICTION

1. The jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1331 (Federal question) and 1343 (Civil Rights), and venue is appropriate under 28 U.S.C. §1391 (all parties are located within the Northern District of Alabama, and all the acts complained of took place in the Northern District of Alabama, Western Division).

2. This is a suit authorized and instituted pursuant to the Act of Congress known as the Civil Rights Act of 1866, 42 U.S.C. §1981, as

1

amended providing relief against race discrimination, color discrimination and retaliation in employment.

3. There are no conditions precedent to the institution of this action under 42 U.S.C. §1981. All of the allegations of the Complaint occurred within four (4) years of the complaint. 28 U.S.C. § 1658(a); *See* Jones v. R. R. Donnelley & Sons Co., 541 U.S. 369 (U.S. 2004); Baker v. Birmingham Board of Education, 531 F.3d 1336, 1339 (11th Cir. 2008)(where the 11th Circuit found the District Court erred in applying the two year 1983 statute of limitation, and held 42 U.S.C. §1981 has a four year statute of limitation pursuant to 28 U.S.C. §1658).

## II. PARTIES

4. The Plaintiff, Brown is over the age of nineteen (19), is a citizen of the United States, a resident of the Northern District of Alabama, Western Division.

5. The Defendant, TMS, is a corporation, which does business in the Northern District of Alabama, Western Division.

## III. FACTUAL ALLEGATIONS

6. Brown is an African American.

7. Brown was employed by TMS at all times material to the complaint.

2

8.  Brown originally worked for Defendant in its Louisiana plant as a Site Manager.

9.  In November, 2016, Brown transferred to the Tuscaloosa location where he became Operations Manager.

10.  Brown was not given the same amenities as his Caucasian comparators.

11.  Brown was not given a manager's office, so he was required to create his own office space.

12.  Brown was not provided a computer, so he had to order his own computer.

13.  Brown's Caucasian coworkers did not have to order their own computers or make their own office space.

14.  On a regular basis employees of TMS engaged in racial comments to each other.

15.  Employees would complain about the racial comments, management would come in to talk about the remarks in meetings with the employees, however, these discussions did not curb the behavior.

16.  In our around April 2017, Brown attended a company manager's meeting in Atlanta, GA.

3

17. During this event, Brown complained to Human Resources President, John Carroll (Carroll), and Vice President, Ralph Castellano (Castellano), about several racially motivated incidents at the Tuscaloosa, AL job site.

18. Specifically, Brown complained to Castellano and Carroll:

    a. black employees had to use different restrooms than their Caucasian coworkers;

    b. black employees could not call maintenance or bring their equipment to maintenance without first calling a manager, Brown, or the maintenance supervisor, Doug Mullins, when their Caucasian coworkers could contact maintenance and bring their equipment in at their own discretion; and

    c. black employees were refused access to the equipment necessary to perform their job duties when Caucasian employees.

19. In response to the above-mentioned complaints, Castellano and Carroll told Brown he should only assist the Site Manager, Joe Burkey (Burkey).

20. Nothing was done about Brown's complaints.

4

21. In or around May or June, 2017, TMS hired a black man named Carl and a group of Caucasian men as mechanics.

22. However, Carl was placed in pressure washing, and was told new employees have to start out as a lube tech.

23. The Caucasian employees, with no experience, were immediately placed in more favorable positions such as truck driver or water truck operator.

24. Two weeks later, a Caucasian employee, with no experience, was hired and placed directly into the mechanic position.

25. Carl complained to Brown, so he took the complaint to Site Manger, Burkey.

26. In or around June 2017, a Caucasian employee, Larry Humphries, made a racist comment "nigger-rig" in front of a Caucasian Foreman, Mike Farlow, and a black employee, Gary (LNU).

27. Gary complained to Site Manager, Burkey, about the racist comment and asked why the Caucasian employee had not been disciplined.

28. Burkey thought the comment was funny and stated he did not know what the word meant.

29. Burkey and Brown met with Humphries and questioned him about his use of the word.

5

30. Burkey just told Humphries not to use the word, and did not discipline him pursuant to the zero tolerance policy.

31. The next day, Brown overheard Larry Humphries in the parking lot making light of the comment and joking about it with another employee, Zach (LNU) in the parking lot.

32. Brown had addressed the matter during his morning safety meeting and reiterated that Defendant had a zero tolerance policy regarding any kind of discrimination.

33. Brown told Burkey what he heard in the parking lot.

34. Burkey asked Brown and Assistant Site Manager Byron what he should do about the situation, but nothing was done.

35. On or around June 26, 2017, Castellano came on site because someone wrote a letter to the corporate office about discrimination.

36. That day, Castellano held a meeting with the employees talking about the issues in the letter and specifically cited the Nigger-rig comment made by Humphries.

37. Castellano told the employees this is a company that give employees a second chances.

38. On or about June 27, Larry Humphries was suspended for three days for the use of the word nigger-rig.

6

39. Sometime later, Assistant Manager, Byron Jones, Caucasian, had a job related accident, left the premises, and did not take a drug test, as required. Also, the incident was not recorded in the log book.

40. Brown was involved in an accident on site and was required to be drug tested and the incident logged unlike his Caucasian coworker Mr. Jones.

41. About a week later, Kevin Shire General Manager, was conducting a meeting wherein he asked the black employee why it was okay for them to use the n-word, but the white employees couldn't.

42. In or around August 2017, Brown asked a Caucasian employee, Shaun (LNU), maintenance employee, to go over a piece of equipment that was needed for a job.

43. Upon checking to see if Shawn had done a walk around with another black employee, Shawn informed Brown that he did not work for Brown who was a manager.

44. Shaun and Brown went to meet with Site Manger, Burkey. Doug Mullins, the Maintenance Supervisor was there and Brown which was inappropriate as he was not there when the incident occurred.

45. Burkey told Brown that the managers needed to work the situation out themselves, and Shaun received no discipline.

7

46. Brown later met with Burkey and complained he didn't think he handled the situation the right way because he was a manager and Shaun should perform tasks that managers request them to do.

47. Brown further inquired whether his skin color had anything to do with the way it was handled and Burkey implied it was not.

48. On or about October 10, 2017, an unknown person wrote, "Niggar get out" on a sign posted on Brown's office door that originally stated, "KEEP THIS DOOR SHUT AND LOCKED AT ALL TIMES FOREMAN ONLY".

49. Brown attempted to contact Burkey by telephone to report the existence of the note, however, Burkey did not immediately respond.

50. Brown took a picture of the note and emailed it to Burkey the Site Manager, Carroll in Human Resources, Castellano the Vice President, and Shire the General Manager.

51. Approximately one hour later, John Ponzoric, Vice President of Human Resources emailed Brown stating that there would be an investigation.

52. Later, Burkey called Brown to his office to inquire about the incident and Brown's whereabouts.

53. Brown asked Mr. Burkey to pull up the security camera.

8

54. Burkey responded that he had the security cameras turned the prior week and never turned them back.

55. That same day, Burkey held a company-wide meeting which was supposed to address the issue with the note.

56. Brown spoke up at the meeting and was abruptly stopped by an angry Burkey, because Brown mentioned that the company does not tolerate racism of any kind.

57. Employees were angry that nothing happened to Humphries when he used the n-word.

58. Also, during this meeting, Jason Scales complained of racism.

59. Brown and Scales were so upset, they left the meeting.

60. On or about October 11, 2017, Brown was called into Burkey's office for a conference call with him and Carroll regarding Brown and Burkey not getting along.

61. Brown was told he had two options (1) take a severance pay or (2) transfer to Texas.

62. Brown stated that he would transfer.  Carroll then told him to take some time off and that he would call Brown.

63. While Brown was off work, TMS told Nucor Mill about the racist note, and it told TMS they needed to bring Brown back to work.

64.   On or about October 16, 2017, Carroll called Brown back to work and stated that Brown was an asset to the company.

65.   Carroll also told Brown they were having the note analyzed by a handwriting expert.

66.   On or about October 20, 2017, Brown was called into Mr. Burkey's office and told that according to the expert, Jason Scales had written the note.

67.   Kevin Shire, General Manager, was also at this meeting and he stated that he did not believe Scales wrote the note.

69.   On October 20, 2017, Scales was placed on a 5 day suspension pending termination for "violation of the company harassment policy and general safety rules".

70.   On October 27, 2017, Scales was called into work by management because they were short on help.

71.   However, when Scales arrived at work on October 27, 2018, he was told he was terminated for violating the harassment policy, general safety and work rules.

72.   On or about December 5, 2017, Carroll came to the Tuscaloosa plant to take part in a Sensitivity Training course.

73. That same day, Brown was called into Burkey's office to be questioned by Burkey and Ponzurac about his company phone records, which they stated showed Brown had been in contact with former employee Scales.

74. Brown stated he did not remember having any contact with Scales after Scales' termination, but Scales had named Billy Brown as a reference for another job.

75. Burkey and Ponzurac accused Brown of sharing confidential information which they would not identify with Nucor employees which was false.

76. Brown was terminated on December 5, 2017.

77. After his termination, Brown contacted Costellano and Shire to ask why he had been terminated and they did not respond.

78. Brown was able to get in touch with Carroll who told him he was fired because he was not supervisor material.

79. Brown inquired if he was not supervisor material, why wasn't he counseled on it? And Burkey responded that Tusacloosa was not working out for him, he didn't know where to send him.

11

80. On or about December 14, 2017, Burkey contacted Brown to offer him a severance package which included a release of all Brown's claims stating it would be in the best interest of the company.

81. Caucasian employees wore rebel flags on their t-shirts and trucks work without discipline.

82. Roger Parish, Yard 4 foreman, called a black employee Sambo without discipline.

83. One employee, Steven, was called a mutt because of his bi-racial baby.

## IV.  CLAIMS

### COUNT I- RACE DISCRIMINATION-
### DISPARATE TREATMENT 42 USC 1981

84. The defendant discriminated against the plaintiff because of his race in the terms, conditions, and privileges of employment.

85. The Plaintiff, Brown is a member of a protected class as he is an African American.

86. Brown was treated different from other similarly situated employees when he was not given proper equipment, was not given a manager's office, was required to make space for an office, was require to order his own computer, was required to use different bathrooms, was required to take a drug test and log an incident, was not given supervisory

12

authority as a manager over employees, did not have employees disciplined when they were insubordinate,  terminated for the allegedly contacting Jason Scales after Scales' termination and talking to Nucor, and/or terminated Brown for writing the note.

87. The stated reason for his termination was is pretext as Brown did not provide Nucor, Scales, or any other employee confidential TMS information.

88. Brown was caused to be injured and damaged including, but not limited to: lost wages (both front and back pay with interest); lost benefits; being forced to seek other employment and/or income; to have his career significantly adversely impacted; loss of seniority, mental anguish, emotional distress, depression, sadness, fear, anxiety, humiliation, shame, stress, worry, sleepless nights, and out of pocket expenses.

## COUNT II-RETALIATION-42 USC 2000(e) et. seq.

89. The defendant TMS retaliated against Brown for reporting and objecting to acts of racial discrimination and/or for participating or assisting other employees in any manner in their reports of racial discrimination.

90.    When the Plaintiff complained of disparate treatment and common racial slurs being allowed and nothing done about it, the defendant retaliated by undermining his supervisory authority by calling in other

13

managers into a disciplinary meeting for an employee, by refusing to discipline employees who are insubordinate toward Brown, by calling Brown into a meeting the day after one of his complaint of racial remarks about his inability to get along with Burkey and telling Brown he needed to take a severance or go back to Texas, by sending Brown home the day after this verbal complaint, and by terminating Brown for allegedly speaking with Scales and Nucor.

91. The stated reason for his termination was is pretext provide confidential information about TMS to anyone, there was no evidence of any disciplinary history or performance problems and Carroll told Brown he was an asset to TMS.

92. As a result of the foregoing, Brown was caused to be injured and damaged including, but not limited to: lost wages (both front and back pay with interest); lost benefits; being forced to seek other employment and/or income; to have his career significantly adversely impacted; loss of seniority, mental anguish, emotional distress, depression, sadness, fear, anxiety, humiliation, shame, stress, worry, sleepless nights, and out of pocket expenses.

## **COUNT III- DISCRIMINATORY DISCHARGE (RACE)**

93. The Plaintiff is an African American.

14

94.  Race was a motivating factor in Brown's termination as is an African American, he advocated for the equal treatment of black employees on a consistent basis at TMS, Carroll and Ponzurac claimed they believed Brown was the one who posted the note on his own door using the word "niggar" and was the one causing racial strife at TMS.

95.  The stated reason for her termination was is pretext as Brown did not provide Nucor, Scales, or any other employee confidential information about TMS. Carroll told Brown he was an asset to the company, Brown had never been counseled or disciplined for his performance at TMS prior to his termination.

96.  As a result of the foregoing, Brown was caused to be injured and damaged including, but not limited to: lost wages (both front and back pay with interest); lost benefits; being forced to seek other employment and/or income; to have his career significantly adversely impacted; loss of seniority, mental anguish, emotional distress, depression, sadness, fear, anxiety, humiliation, shame, stress, worry, sleepless nights, and out of pocket expenses.

## COUNT IV- HOSTILE WORK ENVIRONMENT-42 USC 1981

97.  Racial slurs and disparate treatment were so common and made on a regular basis at TMS that employees including Brown would complain and

15

management would be forced to hold meetings with its employees in attempt to curb the behavior.

98. While TMS did hold meetings with its employees which were meant to address racial issues, it did not address the issues and did nothing to curb the behavior of its employees.

99. In fact, Burkey abruptly interrupted Brown during a meeting when he brought up racial issued and zero tolerance undermining his supervisory authority.

100.     TMS was so permeated with discriminatory intimidation, ridicule, and insult so much that treated Caucasian employees differently, not supplying the employees equipment, or access to maintenance, it allowed white employees to wear rebel t-shirts and display rebel flags in their trucks, it allowed the yard 4 foreman to call another employee "Sambo", it allowed another employee to be called a "mutt" because he had a bi-racial baby, it allowed Humphries to use the work "nigger-rig" twice before being disciplined when it turned around and accused another black employee and terminated him for the alleged use of the word demonstrating black employees would not be treated fairly, it allowed other managers to attend disciplinary meetings when they had nothing to do with the discipline, and did not discipline Caucasian employees who were insubordinate to

16

Brown, and they even claimed they believed Brown had written the note, they told Brown he needed to be transferred when he complained of racism ratifying the racial acts that were occurring at the plant and vilifying those employees, including Brown, who chose to complaint of racism they were experiencing, and all of these actions cumulatively were sufficiently severe or pervasive that it altered Brown's employment (he was not given any authority, constantly undermined, and terminated) and created an abusive and hostile working environment.

101. As a result of the foregoing, Brown was caused to be injured and damaged including, but not limited to: lost wages (both front and back pay with interest); lost benefits; being forced to seek other employment and/or income; to have his career significantly adversely impacted; loss of seniority, mental anguish, emotional distress, depression, sadness, fear, anxiety, humiliation, shame, stress, worry, sleepless nights, and out of pocket expenses.

## V. DAMAGES

102. Brown was caused to be injured and damaged including, but not limited to: lost wages (both front and back pay with interest); lost benefits; being forced to seek other employment and/or income; to have his career significantly adversely impacted; loss of seniority, mental anguish,

17

emotional distress, depression, sadness, fear, anxiety, humiliation, shame, stress, worry, sleepless nights, and out of pocket expenses.

103. Brown is seeking an unspecified amount of compensatory and punitive damages to be determined by the jury.

104. Brown is seeking attorney's fees and costs for the litigation.

## VI.   PRAYER FOR RELIEF

WHEREFORE, the plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.      Enter an Order requiring the defendant to make the plaintiff whole by awarding him reinstatement, lost wages (both back pay and future pay) plus interest,  out of pocket expenses, compensatory and punitive damages, loss of benefits, loss of retirement, loss of pension, loss of seniority, and other benefits of employment.

2.      The Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses.

**THE PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY.**

Respectfully Submitted,

Patricia A. Gill
GIL047

Attorney for Plaintiff

**OF COUNSEL:**

PATRICIA A. GILL, P.C.
PO Box 55304
Birmingham, AL 35255
Phone:  (205) 930-9800
Facsimile:  (205) 930-9809
E-Mail:  patriciagill@yahoo.com

**PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL:**

TMS International, LLC
Care of Registered Agent
United Agent Group Inc.
6 Office Park Circle #100
Mountain Brook, AL 352333